NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-13468


   ERIC MACK  vs.  DISTRICT ATTORNEY FOR THE BRISTOL DISTRICT.



        Suffolk.     December 6, 2023. - April 26, 2024.

 Present:  Budd, C.J., Gaziano, Kafker, Wendlandt, & Georges, JJ.


Public Records.  District Attorney.  Privacy.  Police Officer.
     Statute, Construction.  Practice, Civil, Summary judgment,
     Burden of proof.  Attorney at Law, Work product.  Words,
     "Misconduct."




     Civil action commenced in the Superior Court Department on February 2, 2022.

     The case was heard by James Budreau, J., on a motion for summary judgment.

     The Supreme Judicial Court granted an application for direct appellate review.


     Mary Lee, Assistant District Attorney, for the defendant.
     Howard Friedman for the plaintiff.
     Graham D. Welch for Lawyers for Civil Rights Boston & others.
     The following submitted briefs for amici curiae:
     Rebecca Jacobstein, Committee for Public Counsel Services, Mason A. Kortz, Jessica J. Lewis, & Daniel L. McFadden for Andrew Quemere & others.
     Nick J. Erickson, of Colorado, Brian S. Fraser, of New York, & David Milton for National Police Accountability Project.

Randall E. Ravitz, Special Assistant Attorney General, for Massachusetts Peace Officer Standards and Training Commission.
David E. Sullivan, District Attorney, & Cynthia M. Von Flatern, Assistant District Attorney, for district attorney for the northwestern district.

GAZIANO, J.  In this action, the plaintiff, Eric Mack, has requested, pursuant to G. L. c. 66, § 10 (public records law), certain records that relate to the fatal shooting of his brother, Anthony Harden (decedent).  A judge in the Superior Court granted the plaintiff's motion for summary judgment, mandating disclosure of the requested documents, absent a few minor exceptions.  Seeking to prevent the disclosure of these records, the district attorney for the Bristol district (district attorney's office) appealed from the judge's order and asserts that each of the requested records is exempt from the definition of "public records" under at least one of three enumerated exemptions:  the privacy exemption, the policy deliberation exemption, and the investigatory exemption.  See G. L. c. 4, § 7, Twenty-sixth (c), (d), (f).  The district attorney's office further argues that, pursuant to G. L. c. 6E, §§ 1 et seq., the Massachusetts Peace Officer Standards and Training Commission (POST commission) has exclusive authority to release officers' names.  For the following reasons, we affirm in part, reverse in part, and remand the case to the trial court

for a determination whether the investigatory exemption applies to certain material.[1]

Background.  We summarize the facts that are undisputed, viewed in the light most favorable to the party against whom summary judgment was entered -- here, the district attorney's office.  See HSBC Bank USA, N.A. v. Morris, 490 Mass. 322, 326-327 (2022).

1.  The shooting.  The following facts are taken primarily from the final report of the district attorney's office on its findings and conclusions regarding the officer-involved shooting of the decedent (final DAO report), as well as from other documents in the record.

On November 22, 2021, Officers Michael Sullivan and Chelsea Campellone of the Fall River police department traveled to the residence of a woman who had reported a domestic violence incident.[2]  The woman reported to the officers that a man she was

---

[1] We acknowledge the amicus briefs submitted by the district attorney for the northwestern district; National Police Accountability Project; Lawyers for Civil Rights Boston, Citizens for Juvenile Justice, National Lawyers Guild, New England First Amendment Coalition, and Strategies for Youth, Inc.; and Andrew Quemere, Committee for Public Counsel Services, and American Civil Liberties Union of Massachusetts, Inc.  We also acknowledge the amicus letter submitted by the POST commission.

[2] The officers were identified as "the male officer" and "the female officer" in the final DAO report, pursuant to a policy of the district attorney's office to refrain from

dating had choked her and struck her in the face with a stick two days prior.  After documenting her facial injuries, the officers determined that there was probable cause to arrest the man.

That man was the decedent.  Having previously been charged with domestic violence offenses and reckless endangerment of a child, the decedent was confined to his residence by court order at the time the woman reported the domestic violence incident. The decedent resided with the plaintiff (his twin brother) and his landlord.

A surveillance camera outside the decedent's residence recorded Sullivan and Campellone arriving on the evening of November 22.  The officers spoke first with the decedent's landlord, who permitted the officers to enter the residence and directed them to the decedent's bedroom.  Sullivan then went to the decedent's bedroom and announced his presence to the decedent from the doorway.  After a brief exchange, the decedent refused to step outside and speak with the officers.  Sullivan explained to the decedent that he was being placed under arrest.

The decedent reached for an item on his desk.  Although Sullivan was unable to see what the decedent grabbed, Campellone

---

publicly identifying officers involved in fatal shootings when no criminal charges are issued.  The officers were named, however, in a search warrant affidavit and in the plaintiff's complaint.

believed the metallic and pointed item in his possession was a knife. The decedent quickly approached Sullivan, holding the item in his right hand, and tried repeatedly to stab Sullivan in the neck and head with the item. As Sullivan and the decedent struggled, Campellone fired two shots from her service weapon, and the decedent fell over.

Sullivan promptly requested emergency medical personnel, who arrived at the decedent's residence minutes later, along with several additional Fall River police officers. A police sergeant who arrived on the scene following the shooting found Sullivan and Campellone with their weapons drawn, pointing toward the decedent's bedroom. Sullivan told the sergeant, "That guy just tried to kill me with a knife!"

On entering the decedent's bedroom, the sergeant observed the decedent laying on his stomach just inside the doorway, groaning and moving his hands. The sergeant requested that the decedent stop moving his hands and attempted to place handcuffs on him. The decedent resisted at first, but ultimately, officers were able to handcuff him and began administering medical aid.

As officers worked to clear the scene for emergency personnel, one officer found a knife on the floor near the decedent. That same officer then moved the knife onto a table

in the bedroom to ensure the safety of incoming emergency personnel.

The decedent was treated for his gunshot wounds and transported to a hospital.  Within thirty minutes from the time Sullivan and Campellone first approached him in his bedroom, the decedent was pronounced dead.

The plaintiff raises several questions regarding the final DAO report.  Chief among them is whether the decedent did in fact possess a knife when he allegedly attacked Sullivan.  Various officers alternatively reported not seeing a knife at all, observing a black-handled steak knife on the decedent's desk, finding a black-handled steak knife on the floor near the decedent's feet, or discovering a knife underneath the decedent after the decedent was rolled over to administer medical aid.[3]

2.  Investigation of the shooting.  In coordination with the State police, the district attorney's office conducted a five-month long investigation into the decedent's death pursuant to G. L. c. 38, § 4, which mandates that, in "cases of unnatural or suspicious death . . . [t]he district attorney or his law enforcement representative shall direct and control the

---

[3] After conducting a search of the residence, officers reported finding a total of three steak knives at various locations in the decedent's bedroom.

investigation of the death."[4]  The purpose of this investigation was to determine whether the two responding officers were criminally responsible for the decedent's death.  Investigators interviewed four percipient witnesses and approximately twenty additional civilian and law enforcement witnesses.

The district attorney's office either acquired or created the following records while investigating the decedent's death: videotaped interviews of Fall River police officers and fire department paramedics who were involved in the incident (videotaped public employee interviews); Sullivan's personnel records; the decedent's autopsy and medical records; crime scene reports listing items recovered from the apartment and detailing subsequent forensic testing; video footage from surveillance cameras on a neighboring property that was recorded between November 20 and November 22, 2021 (home security videos); twenty-six crime scene photographs depicting the decedent's residence, including his bedroom, bathroom, kitchen, and shared living spaces (crime scene photographs); a brief typewritten document titled "Room Summary," which was authored by an assistant district attorney and consists of several bullet points that recount the factual events leading to the decedent's death (room summary); and a homicide report prepared by the

_____

[4] No independent internal affairs investigation of the Fall River police department was performed.

State police, which includes a nine-paragraph summary of the events surrounding the decedent's shooting and appends summaries of the videotaped public employee interviews (MSP homicide report).[5]

While the investigation remained ongoing, the district attorney's office prepared a preliminary report in December 2021 summarizing its findings and conclusions regarding the shooting (preliminary DAO report).[6]  The preliminary DAO report includes details on the decedent's background, a summary of the domestic violence incident that prompted the officers' arrival at the decedent's residence, a description of the events surrounding

---

[5] The names of the officers being interviewed, among other information, are redacted from the interview summaries appended to the MSP homicide report.  A draft of the MSP homicide report, discussed infra, was completed in November 2021.  The district attorney's office released the final MSP homicide report online to the public in April 2022.  The most significant difference between the final MSP homicide report and the draft MSP homicide report is the "approved" status indicated at the top of the document.

[6] The preliminary DAO report mistakenly was referred to as the final report in an initial e-mail message to the plaintiff. On December 22, 2021, a staff member at the district attorney's office sent an e-mail message to the plaintiff indicating that a "final report" on the shooting was attached.  However, this same staff member later submitted an affidavit in which he explained that he had incorrectly assumed that the report was final.  In addition to the preliminary DAO report that was sent to the plaintiff and the final DAO report that was released to the public, the district attorney's office prepared an earlier draft preliminary DAO report, discussed infra, that was circulated within the district attorney's office and "subject to attorney review."

the shooting, an explanation of the Fall River police department's policy on the use of force, and a conclusion that there was "no basis" to find that Sullivan or Campellone had committed a crime.

On completing its investigation, the district attorney's office released the final DAO report to the public in April 2022. In addition to the information from the preliminary DAO report detailed supra, the final DAO report includes supplemental details on the decedent's domestic violence offenses and child endangerment charges, as well as a summary of the decedent's medical examination and autopsy report. The final DAO report again concludes that there was "no basis" to charge either of the two responding officers with a crime. The district attorney's office also describes the Fall River police department's use of force policy, which states that a "law enforcement officer shall not use deadly force upon a person unless de-escalation tactics have been attempted and failed or are not feasible based on the totality of the circumstances." The policy permits an officer to use deadly force if there is no other reasonable alternative and the officer has an objectively reasonable belief that deadly force is necessary to protect herself or another. The district attorney's office found in its report that Sullivan and Campellone did not violate the use of force policy, reasoning that the officers had probable cause to

arrest the decedent and that it was reasonable to believe that the decedent was attempting to use deadly force.

3. The public records request and responses. After receiving a copy of the preliminary DAO report, the plaintiff wrote to the district attorney's office on January 10, 2022, requesting public records pursuant to G. L. c. 66, § 10 (b). In his letter, the plaintiff requested (1) all documents relating to any incidents that occurred between November 20 and November 22, 2021, involving Fall River police officers and the decedent; (2) all audio recordings concerning the decedent between November 20 and November 22, 2021; (3) all video recordings and photographs that show the decedent or officers who interacted with the decedent on November 22, 2021; and (4) all documents relating to any investigations of incidents involving the decedent that occurred between November 20 and November 22, 2021.

The district attorney's office responded in a letter dated January 25, 2022, denying the plaintiff's request for public records primarily because the investigation was ongoing. The district attorney's office further explained its belief that many of the records the plaintiff requested were exempt from the definition of "public records" under the public records law and thus would not be disclosed, even after the completion of the investigation.

On April 1, 2022, the district attorney's office sent another letter and the final DAO report to the plaintiff. This letter included the website address of the district attorney's office, where anyone could view the public records that the district attorney's office identified as responsive to the plaintiff's request. The district attorney's office explained in its letter that certain records would not be disclosed to the plaintiff. Relevant here, the district attorney's office stated, "[a]ll recorded witness interviews and certain audio and video recordings," some photographs, and the names of police officers were being withheld under the privacy exemption. The district attorney's office also indicated certain records were being withheld under the investigatory exemption because their production "would disclose investigatory techniques and potentially hinder the effectiveness of future investigations." Last, the district attorney's office claimed that records constituting work product were being withheld under the policy deliberation exemption.

4. The lawsuit. On February 2, 2022, the plaintiff commenced an action in the Superior Court pursuant to G. L. c. 66, § 10A, seeking injunctive and declaratory relief to compel the disclosure of public records held by the district attorney's office. In his complaint, the plaintiff sought the

same four types of records he had identified in his initial public records request to the district attorney's office.

In September 2022, the plaintiff filed a motion for summary judgment in which he requested an order from the Superior Court compelling the district attorney's office to produce the documents and information he had requested. The district attorney's office filed both an opposition to the plaintiff's motion and a cross motion for summary judgment, asserting that it properly had withheld certain records and redacted certain information that was not subject to disclosure under the public records law. Specifically, the district attorney's office maintained that the additional records the plaintiff sought were exempt from disclosure under at least one -- and in some instances, multiple -- of the following statutory exemptions from the definition of "public records": (1) G. L. c. 4, § 7, Twenty-sixth (c) (privacy exemption); (2) G. L. c. 4, § 7, Twenty-sixth (d) (policy deliberation exemption); and (3) G. L. c. 4, § 7, Twenty-sixth (f) (investigatory exemption).

The motion judge held a hearing in February 2023 at which he reviewed several contested documents in camera. On March 10, 2023, the judge issued an order granting the plaintiff's motion for summary judgment with minor exceptions and entered judgment in favor of the plaintiff.

In April 2023, the district attorney's office appealed from the judge's decision and the resulting judgment in favor of the plaintiff. We then allowed an application for direct appellate review submitted by the district attorney's office.

Discussion. On appeal, the district attorney's office claims that the motion judge erred in granting the plaintiff's motion for summary judgment because the requested records are exempted from disclosure. The district attorney's office asserts, as it did below, that the privacy exemption applies to (1) the crime scene photographs; (2) the home security videos (and still images taken from those video recordings); (3) the names of police officers and other public employees, which were redacted from the preliminary and final DAO reports; and (4) the videotaped public employee interviews. Next, the district attorney's office claims that the investigatory exemption applies to (1) the videotaped public employee interviews; (2) the home security videos; and (3) a list of interview questions that a State police investigator asked the two responding officers (investigator's interview questions). Finally, the district attorney's office argues that the policy deliberation exemption applies to (1) a draft of the MSP homicide report; (2) a draft of the preliminary DAO report; and (3) the room summary. We address each asserted exemption below.

1. _Standard of review_. We review a judge's decision on a motion for summary judgment de novo. _Matter of the Estate of Jablonski_, 492 Mass. 687, 690 (2023). "Summary judgment is appropriate where there is no material issue of fact in dispute and the moving party is entitled to judgment as a matter of law" (citation omitted). _Adams_ v. _Schneider Elec. USA_, 492 Mass. 271, 280 (2023). As summary judgment was entered against the district attorney's office, we review the evidence in the light most favorable to it. See _HSBC Bank USA, N.A._, 490 Mass. at 326-327.

2. _Public records law_. Two statutes govern public records requests: G. L. c. 66, § 10 (a), which requires agencies, like the district attorney's office, to provide access to public records on request; and G. L. c. 4, § 7, Twenty-sixth, which defines the scope of public records. See _Rahim_ v. _District Attorney for the Suffolk Dist._, 486 Mass. 544, 547 (2020). The primary purpose of these statutes is to provide the public "broad access to government records" and information on "whether public servants are carrying out their duties in an efficient and law-abiding manner" (citations omitted). _Attorney Gen_. v. _District Attorney for the Plymouth Dist_., 484 Mass. 260, 262-263 (2020).

The Legislature broadly defined the term "public records."
See G. L. c. 4, § 7, Twenty-sixth.[7]  See also Boston Globe Media
Partners, LLC, v. Department of Pub. Health, 482 Mass. 427, 432
(2019).  Paired with this broad definition is a statutory
presumption in favor of disclosure, with the burden placed on
the government agency to prove by a preponderance of the
evidence that a record may be withheld.  See G. L. c. 66,
§ 10A (d) (1) (iv).  See also Rahim, 486 Mass. at 549.  The
Legislature has carved out various enumerated exemptions from
the definition of "public records," including the privacy
exemption, the policy deliberation exemption, and the
investigatory exemption.  See G. L. c. 4, § 7, Twenty-sixth (c),
(d), (f).  See also Attorney Gen., 484 Mass. at 263.  These

---

[7] Specifically, the term "public records" is defined,
subject to certain exemptions, as:

"all books, papers, maps, photographs, recorded tapes,
financial statements, statistical tabulations, or other
documentary materials or data, regardless of physical form
or characteristics, made or received by any officer or
employee of any agency, executive office, department,
board, commission, bureau, division or authority of the
commonwealth, or of any political subdivision thereof, or
of any authority established by the general court to serve
a public purpose, or any person, corporation, association,
partnership or other legal entity which receives or expends
public funds for the payment or administration of pensions
for any current or former employees of the commonwealth or
any political subdivision as defined in [G. L. c. 32,
§ 1]."

G. L. c. 4, § 7, Twenty-sixth.

exemptions are "strictly and narrowly construed" (citation omitted).  Boston Globe Media Partners, LLC, supra.  Whether an exemption applies requires a case-by-case analysis.  See Rahim, supra.

a.  Privacy exemption.  The privacy exemption applies to "personnel and medical files or information and any other materials or data relating to a specifically named individual, the disclosure of which may constitute an unwarranted invasion of personal privacy."  G. L. c. 4, § 7, Twenty-sixth (c).  In 2020, the Legislature passed "An Act relative to justice, equity and accountability in law enforcement in the Commonwealth."  St. 2020, c. 253.  Among other provisions, this act amended the privacy exemption of the public records law and established the POST commission to increase transparency in law enforcement investigations.  See St. 2020, c. 253, §§ 2, 30.  See also Letter from the Governor to the Senate and House (Dec. 10, 2020), 2020 Senate Doc. No. 2975 ("This bill makes law enforcement more accountable for their conduct and provides the public with direct insight into officers' performance history[,] which not only creates greater transparency in law enforcement but also gives departments greater ability to hire or promote only qualified applicants").  Specifically, the act created a new carve-out within the privacy exemption for "records related to a law enforcement misconduct investigation."  G. L. c. 4,

§ 7, Twenty-sixth (c), as amended through St. 2020, c. 253, § 3. That is, records that would otherwise fall within the privacy exemption but are "related to a law enforcement misconduct investigation" may not be withheld from disclosure under this exemption.

On appeal, the district attorney's office argues it properly withheld the crime scene photographs, the home security videos, the still images, the names of officers and public officials, and the videotaped public employee interviews under the privacy exemption. The district attorney's office claims that disclosing the crime scene photographs would violate the decedent's privacy rights because they reveal the decedent's "unclean bathroom" and "unkempt home" with "trash bags piled up" as well as "a disturbing notation on the [decedent's] calendar." The district attorney's office also contends that releasing the home security videos and still images would create an unwarranted invasion of privacy for private individuals who voluntarily provided the video recordings to the district attorney's office as part of its investigation.[8] Moreover, the district attorney's office asserts that the names of officers and public officials should be withheld to protect their

---

[8] The plaintiff's request for video footage is limited to video recordings that show either the decedent or the Fall River police department officers.

privacy.  Last, the district attorney's office argues that withholding the videotaped public employee interviews and instead releasing reports summarizing their substance properly balanced the public interest "in knowing about the conduct of the public employees" with "the privacy interests and safety of the individuals involved."

The motion judge balanced the decedent's privacy interest in the requested records against the public interest in disclosure and found that the "equities substantially favor[ed]" disclosure.  See Champa v. Weston Pub. Sch., 473 Mass. 86, 96 (2015) ("The inquiry under the privacy exemption requires that the seriousness of any invasion of privacy be balanced against the public right to know" [quotation and citation omitted]).  We need not review the judge's application of the balancing test because all records identified by the district attorney's office fall under the "law enforcement misconduct investigation" carve-out to the privacy exemption.  Thus, the privacy exemption cannot be used to withhold these records from disclosure.

The district attorney's office argues that "[w]here the shooting was deemed to be justified in this death investigation under [G. L. c. 38, § 4], and no criminal prosecution ensued, the records are not 'law enforcement misconduct' records at all."  Essentially, the district attorney's office asserts that unless an investigation ends in a finding that a law enforcement

officer engaged in misconduct, the carve-out to the privacy exemption does not apply.

This contention of the district attorney's office finds no support in the language of the statute.  General Laws c. 4, § 7, Twenty-sixth (c), provides, in relevant part, that the privacy exemption "shall not apply to records related to a law enforcement misconduct investigation."[9]  In questions of statutory interpretation, we begin with the plain language of the statute.  See Commonwealth v. Escobar, 490 Mass. 488, 493 (2022).  The ordinary meaning of "misconduct" is "[a] dereliction of duty; unlawful, dishonest, or improper behavior, esp[ecially] by someone in a position of authority or trust." Black's Law Dictionary 1195 (11th ed. 2019).  As the district attorney's office has acknowledged, the purpose of the investigation in this case was to determine whether the two responding officers committed any crimes or violated the Fall River police department's use of force policy in relation to the decedent's death.  A police officer's commission of a crime in the performance of his or her official duty is both "unlawful"

---

[9] The phrase "related to" is construed broadly.  See, e.g., Marsh v. Massachusetts Coastal R.R., 492 Mass. 641, 651 n.21 (2023), petition for cert. filed, U.S. Supreme Ct., No. 23-669 (Dec. 21, 2023); Machado v. System4 LLC, 471 Mass. 204, 206 (2015).

and a "dereliction of duty."  An officer's use of excessive force is likewise a dereliction of that officer's duty.

General Laws c. 4, § 7, Twenty-sixth (c), clearly and unambiguously states that the privacy exemption does not apply to an "investigation" of law enforcement misconduct.  To require the investigation to end with a finding of police misconduct places the cart before the horse and runs counter to the goals of police accountability and transparency.  Thus, the investigation into the shooting of the decedent in this case was a "law enforcement misconduct investigation."  Accordingly, the crime scene photographs, the home security videos, the still images, the names of officers and public officials, and the videotaped public employee interviews each "relate[] to a law enforcement misconduct investigation" and may not be withheld under the privacy exemption.[10]

b.  Investigatory exemption.  Under G. L. c. 4, § 7, Twenty-sixth (f), any "investigatory materials necessarily compiled out of the public view by law enforcement or other investigatory officials" are exempt from the definition of "public records" if disclosing such materials "would probably so

_____

[10] That the privacy exemption does not apply to the videotaped public employee interviews does not necessarily mean that the interviews must be disclosed.  As discussed infra, this matter will be remanded for a determination whether the investigatory exemption applies to the videotaped public employee interviews.

prejudice the possibility of effective law enforcement that such disclosure would not be in the public interest."  This exemption is "aimed at 'the avoidance of premature disclosure of the Commonwealth's case prior to trial, the prevention of the disclosure of confidential investigative techniques, procedures, or sources of information, the encouragement of individual citizens to come forward and speak freely with police concerning matters under investigation, and the creation of initiative that police officers might be completely candid in recording their observations, hypotheses and interim conclusion.'"  Reinstein v. Police Comm'r of Boston, 378 Mass. 281, 289 (1979), quoting Bougas v. Chief of Police of Lexington, 371 Mass. 59, 62 (1976).

This is not a blanket exemption that applies to any record kept by a police department for an investigation.  See Bougas, 371 Mass. at 65.  Instead, we analyze whether this exemption applies on a case-by-case basis.  See Globe Newspaper Co. v. Police Comm'r of Boston, 419 Mass. 852, 859 (1995).  In doing so, we ask whether a requested disclosure "would be so prejudicial to effective law enforcement that it is in the public interest to maintain secrecy."  Id.  Where an investigation is closed, this fact alone "does not automatically terminate the applicability" of the investigatory exemption.  Rahim, 486 Mass. at 552.

The district attorney's office argues that the investigatory exemption applies to the videotaped public employee interviews.  It reasons that disclosing these video-recorded interviews would chill prospective witnesses, both private and public, from agreeing to video-recorded interviews in the future.[11]  The district attorney's office also claims that release of these interviews may reduce the likelihood that officers are "completely candid" when questioned.

We previously have examined the application of the investigatory exemption to the statements of law enforcement officials.  For example, in Globe Newspaper Co., 419 Mass. at 864-865, we held that statements of police officers compiled during internal affairs and criminal investigations were not subject to the investigatory exemption.  Given the available summaries of the internal affairs investigation, the evident public purpose behind the investigation, and prior publicity of these summaries, any harmful effect that disclosure might have had was diminished.  See id.  Because of the previous publicity, disclosing the officers' statements was unlikely to decrease the likelihood that officers would be completely candid in recording

_____

[11] In addition to potentially chilling future witnesses, the district attorney's office had claimed that the release of these videotapes "might also indirectly reveal" the identities of the two officers who were present at the shooting.  However, as discussed supra, the names of these two officers were revealed in a trooper's affidavit and thus already known to the public.

their observations, especially where the possibility of public disclosure was "surely apparent" to the officers at the time they made these statements.  See id.

In Rahim, 486 Mass. at 554-555, we held that the investigatory exemption applied to certain records that a district attorney acquired during an investigation into a fatal shooting by law enforcement officials.  The district attorney identified one withheld document as a five-page statement signed by a Federal agent "concerning actions taken and observations made regarding the shooting," and which "include[d] a one page annotated aerial photograph."  Id. at 554.  While "succinct," this description successfully demonstrated that the records sought identified at least one law enforcement official, described the official's "observations, hypotheses, and interim conclusion," and included a photograph related to these observations.  Id., quoting Bougas, 371 Mass. at 62.  We remanded to the Superior Court for a determination whether the investigatory exemption applied to other material that was inadequately described and instructed the district attorney to either provide a revised description with "enough details about the nature and scope of the materials" or, where "fuller descriptions" were not possible, to seek in camera review of the material at issue.  Rahim, supra at 555-556.

Here, the district attorney's office contends that disclosure of the videotaped public employee interviews would hamper investigation by discouraging witnesses -- both private and public -- from agreeing to video-recorded interviews in the future. However, the video recordings at issue do not depict interviews of private citizens but rather the interviews of seven Fall River police officers and two paramedics. Where we previously have stated that the investigatory exemption is aimed at "the encouragement of individual citizens to come forward and speak freely with police" (emphasis added), Bougas, 371 Mass. at 62, we only have considered this factor for private individuals -- not public officials performing duties in their official capacity. See Rahim, 486 Mass. at 551; Globe Newspaper Co., 419 Mass. at 859; District Attorney for the Norfolk Dist. v. Flatley, 419 Mass. 507, 512 (1995); WBZ-TV4 v. District Attorney for the Suffolk Dist., 408 Mass. 595, 603 (1990); Reinstein, 378 Mass. at 289.

Although the district attorney's office asserted this exemption before the motion judge, the judge did not address whether the investigatory exemption applied to these interviews. Therefore, we remand to the Superior Court to address whether the district attorney's office has met its burden to show that

the investigatory exemption applies.[12]  If the judge finds that the investigatory exemption applies to any record on remand, then the district attorney's office may withhold that record even if another exemption does not apply.  See Globe Newspaper Co., 419 Mass. at 857.

c.  Policy deliberation exemption.  Under the policy deliberation exemption, "inter-agency or intra-agency memoranda or letters relating to policy positions being developed by [an] agency" are exempt from the definition of "public records"; however, "reasonably completed factual studies or reports on which the development of such policy positions has been or may

_____

[12] The district attorney's office has also asserted that the investigatory exemption applies to the investigator's interview questions and to the home security videos.  The motion judge did not address whether this exemption applies to the interview questions.  Therefore, we also remand so that the judge may determine whether the district attorney's office met its burden to show the investigatory exemption applies to the investigator's interview questions.  The judge did, however, consider whether the release of the home security videos would "interfere with future investigations."  The district attorney's office claims that releasing the home security videos will discourage citizens from coming forward and volunteering information, harming future investigations.  We are not convinced.  As discussed supra, the home security videos depict public employees, not private citizens, performing their duties in public areas.  We hold that the district attorney's office has failed to demonstrate how the disclosure of these video recordings "would probably so prejudice the possibility of effective law enforcement that such disclosure would not be in the public interest."  See G. L. c. 4, § 7, Twenty-sixth (f).  Therefore, the district attorney's office has not met its burden of showing that the investigatory exemption applies to the home security videos.

be based" are not exempt.  G. L. c. 4, § 7, Twenty-sixth (d).

See Suffolk Constr. Co. v. Division of Capital Asset Mgt., 449

Mass. 444, 457 (2007) (policy deliberation exemption applies to

"advisory opinions, recommendations and deliberations

compromising part of a process by which governmental decisions

and policies are formulated" [citation omitted]).  This

exemption protects "open, frank intra-agency and intra-agency

deliberations regarding government decisions."  DaRosa v. New

Bedford, 471 Mass. 446, 457 (2015).  See General Elec. Co. v.

Department of Envtl. Protection, 429 Mass. 798, 807 (1999),

overruled in part by DaRosa, supra at 453 (purpose of policy

deliberation exemption "is to foster independent discussions

between those responsible for a governmental decision in order

to secure the quality of the decision").

In applying this exemption, the court utilizes the work

product doctrine and looks to Mass. R. Civ. P. 26, as amended,

474 Mass. 1401 (2016), for guidance.  See DaRosa, 471 Mass. at

458.  There are two forms of work product:  opinion and fact.

Id.  Opinion work product is material that contains "the mental

impressions, conclusions, opinions, or legal theories of an

attorney or other representative of a party concerning the

litigation."  Id. at 459, quoting Mass. R. Civ. P. 26 (b) (3).

All other work product is considered fact work product.  See

Attorney Gen. v. Facebook, Inc., 487 Mass. 109, 128 (2021)

(Facebook).  Absent a "highly persuasive showing" otherwise, opinion work product is exempt from disclosure (citation omitted).  DaRosa, supra.  Conversely, fact work product must be disclosed "if it is a 'reasonably completed factual stud[y] or report[] on which the development of [an agency's] policy positions has been or may be based.'"  Id., quoting G. L. c. 4, § 7, Twenty-sixth (d).[13]  Where a reasonably completed factual study or report is intermingled with opinion, "a purely factual section of the report might fall outside [the policy deliberation exemption] but a discussion or analysis section interwoven with facts would be protected from disclosure."  DaRosa, supra at 460.

Here, the district attorney's office identifies three documents that it claims are work product to which the policy deliberation exemption applies:  (1) a draft of the MSP homicide report, (2) a draft of the preliminary DAO report, and (3) the room summary.  The motion judge found that these three records were fact-based documents to which the policy deliberation exemption did not apply.  We agree that the district attorney's office has not proven that the policy deliberation exemption

---

[13] The policy deliberation exemption is a "time-limited protection" (citation omitted).  DaRosa, 471 Mass. at 455.  It "protects documents from disclosure only while policy is 'being developed,' that is, while the deliberative process is ongoing and incomplete" (quotation and citation omitted).  Id. at 459 n.16.

applies to either the draft of the MSP homicide report or the room summary.  The draft of the MSP homicide report includes only factual details of the decedent's death.  Similarly, the room summary, written by an assistant district attorney, contains only facts relating to the layout of the decedent's residence, a brief summary of the conversation between the decedent and the officers prior to the shooting, and a description of the altercation between the decedent and the officers.  As neither document contains any "mental impressions, conclusions, opinions, or legal theories," these records are not opinion work product.  See DaRosa, 471 Mass. at 459.  Further, the district attorney's office has not met its burden of showing that these documents are not reasonably completed factual studies or reports.

The draft of the preliminary DAO report stands on somewhat different footing.  Like the other two records at issue, the motion judge correctly noted that this draft report primarily is comprised of factual detail.  For example, the draft report includes -- much like the preliminary DAO report and the final DAO report, both of which were released to the public -- sections that detail the decedent's criminal background, the initial domestic violence report to officers by the decedent's girlfriend, and the shooting.  Where sections of the draft report are identical to the corresponding sections in either of

the publicly available reports, the district attorney's office has effectively waived the work product privilege with respect to these sections. See Facebook, 487 Mass. at 135 (party cannot claim protection for opinion work product for information it has released publicly).

However, the draft report is not completely identical. Comparing the different iterations of the DAO report reveals that certain sections of the draft report, labeled "Applicable Laws" and "Conclusion," are different from the corresponding sections in the publicly available reports. These sections also contain discussions of the law and legal analysis addressing whether the responding officers had committed any crime and whether the shooting was justified. Because these sections differ from their publicly available counterparts, they may convey the "mental impressions, conclusions, opinions, or legal theories" as to the criminal responsibility of the officers. See Facebook, 487 Mass. at 127. Moreover, that the final DAO report was voluntarily released to the public does not mean that these sections of an earlier draft report are not protected work product. See Gilhuly v. Johns-Manville Corp., 100 F.R.D. 752, 755 n.4 (D. Conn. 1983) ("Disclosure of a final draft does not automatically waive the work product privilege of prior drafts").

Therefore, it was error for the judge to order disclosure of the entire draft preliminary DAO report. While the district attorney's office has not met its burden of showing that the entire draft report is not a reasonably completed factual study or report, see DaRosa, 471 Mass. at 460, the district attorney's office has met its burden of showing that the policy deliberation exemption applies to the "Applicable Laws" and "Conclusion" sections of the draft report. These two sections are severable from the purely factual sections of the draft report. Therefore, the "Applicable Laws" and "Conclusion" sections of the draft report may be redacted, and the remaining factual sections of the report must be disclosed.

3. General Laws c. 6E. The district attorney's office separately claims that the POST commission has exclusive authority under G. L. c. 6E, §§ 1 et seq., to release publicly the names of police officers in connection with any investigations, thereby taking such information out of the purview of the public records law.[14] In support, the district attorney's office points to the level of detail within G. L. c. 6E, §§ 1 et seq., which it argues creates a clear implication that the Legislature intended the POST commission to be the

---

[14] The POST commission was created through the same act that added the carve-out for law enforcement misconduct investigations to the privacy exemption. See St. 2020, c. 253, § 30 (effective July 1, 2021).

exclusive avenue for members of the public to access law enforcement officers' names.

We turn to the plain language of the statutory scheme at issue, which established the creation of the POST commission. See G. L. c. 6E, § 2. Among other provisions, the statutory scheme grants the POST commission the authority to "establish uniform policies and standards for the certification of all law enforcement officers," G. L. c. 6E, § 4; "to investigate officer misconduct," G. L. c. 6E, § 8; and to "promulgate rules and regulations for the use of force by law enforcement officers," G. L. c. 6E, § 15. Notably absent from this statutory scheme is any provision granting the POST commission exclusive authority to determine whether to release the names of officers involved in law enforcement misconduct investigations. "We do not read into the statute a provision which the Legislature did not see fit to put there, nor add words that the Legislature had the option to, but chose not to include" (citation omitted). Commonwealth v. Dones, 492 Mass. 291, 297 (2023). Based on the plain language of the statute, the statutory construction argument of the district attorney's office fails, and we need not proceed any further. See Commonwealth v. Narvaez, 490 Mass. 807, 809 (2022) ("we follow the plain language when it is unambiguous and when its application would not lead to an absurd

result, or contravene the Legislature's clear intent" [citation omitted]).[15]

Conclusion.  Because the "Applicable Laws" and "Conclusion" sections of the draft preliminary DAO report are exempt from disclosure, we reverse the motion judge's order with respect to the mandated disclosure of these sections.  We also reverse insofar as the order requires disclosure of the videotaped public employee interviews and the investigator's interview questions, and we remand this case to the Superior Court for further proceedings to determine whether the investigatory exemption applies to the interviews or the investigator's interview questions.  In all other respects, the order and judgment in favor of the plaintiff are affirmed.[16]

So ordered.

---

[15] Insofar as the district attorney's office claims that, because of the comprehensive nature of G. L. c. 6E, §§ 1 et seq., the public records law impliedly was repealed to the extent that it allows for the disclosure of officers' names, this argument also fails because we do not see an "irreconcilable conflict" between the two statutory schemes (citation omitted).  See Concord v. Water Dep't of Littleton, 487 Mass. 56, 61 (2021).

[16] In his brief, the plaintiff has requested that we award him appellate attorney's fees and costs.  We decline to do so.

BUDD, C.J. (concurring).  I agree that this matter should be remanded to allow the judge to address whether the investigatory exemption to the public records law applies to the videotaped interviews of public employees, an issue the judge did not address.  See G. L. c. 66, § 10A (d) (1) (iv); G. L. c. 4, § 7, Twenty-sixth (f).[1]  I write separately to note that although the district attorney for the Bristol district (district attorney's office) argues that records of police interviews fall under the exemption because disclosure could disincentivize officers from being candid, attending to this concern is not in keeping with the letter or spirit of the public records law.

The district attorney's office's argument stems from this court's discussion of the investigatory exemption's possible aims in Bougas v. Chief of Police of Lexington, 371 Mass. 59 (1976).  In that case, the court concluded that the records the plaintiffs sought were exempt from disclosure under the language

---

[1] General Laws c. 4, § 7, Twenty-sixth (f), exempts from disclosure

"investigatory materials necessarily compiled out of the public view by law enforcement or other investigatory officials the disclosure of which materials would probably so prejudice the possibility of effective law enforcement that such disclosure would not be in the public interest."

of G. L. c. 4, § 7, Twenty-sixth (<u>f</u>).  <u>Id</u>. at 62.[2]  In discussing

the statute generally, the court also listed possible reasons

that the Legislature provided for an investigatory exemption:

> "Included among the purposes in providing this exemption
> would be the avoidance of premature disclosure of the
> Commonwealth's case prior to trial, the prevention of the
> disclosure of confidential investigative techniques,
> procedures, or sources of information, the encouragement of
> individual citizens to come forward and speak freely with
> police concerning matters under investigation, and <u>the
> creation of initiative that police officers might be
> completely candid in recording their observations,
> hypotheses and interim conclusions</u>" (emphasis added).

<u>Id</u>.

This court since has repeated the <u>Bougas</u> language when

discussing the investigatory exemption, including its reference

to officer candor, on several occasions.  See, e.g., <u>Rahim</u> v.

<u>District Attorney for the Suffolk Dist</u>., 486 Mass. 544, 551,

554-555 (2020); <u>Reinstein</u> v. <u>Police Comm'r of Boston</u>, 378 Mass.

281, 289 (1979).  However, in only two subsequent cases has this

court specifically addressed the argument.  In <u>Rahim</u>, <u>supra</u>,

this court concluded, without elaboration, that a district

---

[2] The plaintiffs in that case sought police reports of an incident that allegedly involved police misconduct.  <u>Bougas</u>, 371 Mass. at 60-61.  Noting that the records contained "complete accounts of police investigatory efforts including the police officer's own observations of the incident in question, statements taken from witnesses, additional information obtained from other sources, some confidential, and leads and tips to be pursued," the court concluded that the requested reports fell under the investigatory exemption because they were "prepared by police officers in connection with their investigation of an incident which led to criminal proceedings."  <u>Id</u>. at 62.

attorney's office's justification as to why one record could be shielded under the investigatory exemption was "sufficient," where the record both displayed "the identity" of a Federal Bureau of Investigation agent and contained that agent's "observations, hypotheses, and interim conclusions" about the incident.  Id. at 554-555, citing Bougas, 371 Mass. at 62.  In the other case, Globe Newspaper Co. v. Police Comm'r of Boston, 419 Mass. 852, 864 (1995), the court directly considered the effect that the disclosure of the police statements at issue might have on officer candor, concluding that disclosure would not "seriously threaten" it.  Moreover, in Globe Newspaper Co., the court appeared to question the premise of the Bougas court's concern by noting that other courts have concluded "with some persuasiveness" that, rather than deter officer candor, "limited disclosure of investigatory materials might promote candor." Id. at 865 n.13.[3]

Presuming that disclosure would be detrimental to officer candor provides police departments (and other agencies) with a ready excuse to oppose the disclosure of information, which

---

[3] In Globe Newspaper Co., 419 Mass. at 865 n.13, the court cited three Federal cases that emphatically rejected the argument that police records may be withheld due to the same concern regarding officer candor.  See id., citing Kelly v. San Jose, 114 F.R.D. 653, 664-666 (N.D. Cal. 1987); Wong v. New York, 123 F.R.D. 481, 483 (S.D.N.Y. 1989); and King v. Conde, 121 F.R.D. 180, 193 (E.D.N.Y. 1988).

otherwise would be available to the public, based on a speculative, intangible, and largely unverifiable concern. Cf. Kelly v. San Jose, 114 F.R.D. 653, 664 (N.D. Cal. 1987) ("the premise that . . . investigating officers will be less forthright in expressing their opinions if there is a risk of disclosure[] is empirically unsupported and very debatable"). As other decisions favorably cited by this court have acknowledged, see Globe Newspaper Co., 419 Mass. at 865 n.13, if anything, "the stronger working hypothesis is that fear of disclosure is more likely to increase candor than to chill it," King v. Conde, 121 F.R.D. 180, 193 (E.D.N.Y. 1988).[4]

An approach that allows concerns for the effect that disclosure might have on officer candor to drive disclosure determinations cannot be squared with the public records statute's "presumption" of disclosure, against which exemptions must be "strictly and narrowly construed" (citations omitted). Boston Globe Media Partners, LLC v. Department of Pub. Health, 482 Mass. 427, 432 (2019). It also conflicts with one of the primary purposes of the public records law, i.e., empowering the

---

[4] Notably, we are not aware of any case since Bougas was decided in which the Commonwealth demonstrated that concern for police candor was a viable reason to shield police testimony, including in the instant case. See G. L. c. 66, § 10A (d) (1) (iv) ("the burden shall be on the defendant agency or municipality to prove, by a preponderance of the evidence, that such record or portion of the record may be withheld in accordance with [S]tate or [F]ederal law").

public to ensure that "public servants are carrying out their duties in an efficient and law-abiding manner."  Attorney Gen. v. District Attorney for the Plymouth Dist., 484 Mass. 260, 262-263 (2020), citing Attorney Gen. v. Collector of Lynn, 377 Mass. 151, 158 (1979).  Transparency is especially critical in the context of community members' interactions with law enforcement. See District Attorney for the Plymouth Dist., supra at 263 (transparency is "an essential ingredient of public confidence in government" [citation omitted]).  See also St. 2020, c. 253, § 2 (amending public records law to clarify that "records related to a law enforcement misconduct investigation" shall not be exempt from disclosure under privacy exemption).

Accordingly, I am doubtful of the arguments to that effect raised by the district attorney's office and wary of embracing the idea, despite its appearance in some of our cases.